**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DISH NETWORK LLC, *et al.*,

Plaintiffs,

vs.

DAVID WEDDELL, *et al.*,

Defendants.

Case No.: 2:26-cv-01623-GMN-EJY

**PRELIMINARY INJUNCTION**

On July 23, 2026, the Court entered the Order Granting in Part Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order, (ECF No. 7). Plaintiffs now move the Court to convert the temporary restraining order ("TRO") into a preliminary injunction. (*See* Reply 2:16–18, ECF No. 32). Also pending before the Court are the Motion to Set Aside Temporary Restraining Order, (ECF No. 22),[1] filed by Defendants Communication Unites Everyone, Inc. ("CUE") and David Weddell, the Motion for Leave to File Excess Pages, (ECF No. 31),[2] filed by Plaintiffs DISH Network L.L.C. and Sling TV L.L.C., and the Motion to Stay Preliminary Injunction Pending Appeal, (ECF No. 35),[3] filed by Defendants.

For the reasons discussed below, the Court DENIES the Motion to Set Aside Temporary

[1] In their Motion to Set Aside Temporary Restraining Order, Defendants move to "immediately vacate the Temporary Restraining Order" entered by the Court. (Mot. Set Aside 1:18–19, ECF No. 22). Because the Court now converts the temporary restraining order into a preliminary injunction, the Court DENIES this Motion as moot.

[2] In their Motion for Leave to File Excess Pages, Plaintiffs request leave to file a Reply which exceeds the 12-page limit set by Local Rules 7-3(a) and (b). (Mot. Leave 2:9–16, ECF No. 31). For good cause appearing, the Court GRANTS the Motion.

[3] In their Motion to Stay Preliminary Injunction Pending Appeal, Defendants move for an order staying any preliminary injunction which enjoins the operation of Defendants' streaming service in its entirety. (*See* Mot. Stay 2:11–3:1, ECF No. 35). Because the preliminary injunction set forth herein enjoins only retransmission of the twenty-three (23) channels that Plaintiffs have identified as infringing and does not enjoin operation of Defendants' streaming service in its entirety, the Court DENIES the Motion as moot.

Restraining Order and the Motion to Stay Permanent Injunction Pending Appeal, GRANTS the Motion for Leave to File Excess Pages, and issues a preliminary injunction.

## I. BACKGROUND

This case arises out of Defendants' alleged violations of the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201(a)(2) and (b)(1), and the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1)(c) and (d). (Mot. TRO 1:6–7, ECF No. 3). Specifically, Plaintiffs allege that Defendants have retransmitted twenty-three (23) of Plaintiffs' channels on the Communication Unites Everyone Streaming Service (the "CUE Service") without authorization. (*Id.* 3:23–4:3); (Duval Decl. ¶¶ 5–6, Ex. 3 to Mot. TRO, ECF No. 3-3).

On June 23, 2026, the Court entered a TRO which, among other things, (1) enjoined Defendants from operating the CUE Service in its entirety, (2) enjoined Defendants from destroying or concealing any hardware or software used to operate the CUE Service, any business records relating to the CUE Service, and any communications relating to the CUE Service, (3) froze any asserts or property belonging to or under the management of Defendants, (4) authorized Plaintiffs, with the assistance of the U.S. Marshal, to capture live connection traffic to and from the servers used to operate the CUE Service for a 24 hour period, (5) ordered that the servers used to operate the CUE Service be taken offline, air gapped, and wrapped in evidence tape, and (6) set a bond amount of $10,000. (Order Granting Mot. TRO 4:23–10:6, ECF No. 7).

After Defendants failed to appear for the first preliminary injunction hearing on July 6, 2026, the Court extended the TRO for fourteen days. (*See* July 6 Minutes, ECF No. 13); (Order Extending TRO, ECF No. 17). The Court thereafter scheduled a second preliminary injunction hearing, where both parties appeared and presented argument. (July 13 Minutes, ECF No. 39).

///

## II. LEGAL STANDARD

Federal Rule of Civil Procedure ("FRCP") 65 governs preliminary injunctions. Fed. R. Civ. P. 65. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish four elements: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).

Moreover, the DMCA authorizes courts to "grant temporary and preliminary injunctions on such terms as [the court] deems reasonable to prevent or restrain a violation." 17 U.S.C. § 1203(b)(1). Similarly, the ECPA authorizes courts to grant "such preliminary and other equitable or declaratory relief as may be appropriate." 18 U.S.C. § 2520(b)(1).

## III. DISCUSSION

Plaintiffs move for a preliminary injunction based on their claims for violation of the DMCA and ECPA. (*See generally* Mot. TRO); (*see also* Reply). The Court begins by determining whether Plaintiffs have established the four *Winter* elements.

### A. The *Winter* Elements

#### 1. Likelihood of Success on the Merits

The Court first turns to Plaintiffs' likelihood of success on their claims for violation of the DMCA, before turning to their claim for violation of the ECPA.

##### a. DMCA Claims

Plaintiff brings two claims for violation of §§ 1201(a)(2) and (b)(1) of the DMCA. (Compl. ¶¶ 36–51, ECF No. 1). Section 1201(a) (1) of the DMCA prohibits the circumvention

of "a technological measure that effectively controls access to a work protected [by copyright.]" 17 U.S.C. § 1201(a)(1). Section 1201(a)(2) of the DMCA prohibits:

> offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that-
>
> > (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected [by copyright];
> >
> > (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected [by copyright]; or
> >
> > (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected [by copyright].

17 U.S.C. § 1201(a)(2).

Section 1201(b) (1) of the DMCA prohibits:

> offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that-
>
> > (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner ... in a work or a portion thereof;
> >
> > (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner ... in a work or a portion thereof; or
> >
> > (C) is marketed by that person or another acting in concert with that person

> with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner ... in a work or a portion thereof.

17 U.S.C. § 1201(b)(1).

Plaintiffs argue that they are likely to succeed on the merits of their DMCA claims because the CUE Service circumvents digital rights management ("DRM") technology, which constitutes a "technological measure" under §§ 1201(a)(2), (b)(1) of the DMCA. (Reply 4:23–5:5). Further, Plaintiffs explain that some channels transmitted on the CUE Service bear the same identifiers as Plaintiff's channels, including (1) matching resolution, (2) matching audio and video encoding, (3) matching video packets and frames, and (4) Plaintiffs' logos. (Mot. TRO 3:5–14); (Chrissan Decl. ¶¶ 10–21, Ex. 4 to Mot. TRO, ECF No. 3-4). Defendants concede that DRM technology qualifies as a "technological measure" under the DMCA, arguing instead that Plaintiffs have provided no evidence that the CUE Service was primarily designed for circumvention or that the CUE Service does not have only limited commercial purposes other than circumvention. (Opp. 10:25–11:2, ECF No. 25). Specifically, Defendants assert that because "only a small fraction of the content available through the CUE Service" is alleged to be infringing, the "vast majority" of the content provided by the CUE Service is commercially significant. (*Id.* 11:10–13).

Contrary to Defendants' assertion, Plaintiffs have provided evidence that the CUE Service is primarily designed to circumvent a technological measure. Plaintiffs have provided sworn testimony from electrical engineer Douglas Chrissan explaining that the CUE Service is "primarily designed . . . for the purpose of circumventing Sling's DRMs and the protections against copying that they afford," coupled with a detailed analysis of how the CUE Service circumvents Plaintiffs' DRMs. (*See* Chrissan Decl. ¶¶ 13–21, 22, Ex. 4 to Mot. TRO); *see also DISH Network, L.L.C. v. SatFTA*, No. 5:08-cv-01561-JF, 2011 WL 856268, at *3–4 (N.D. Cal.

Mar. 9, 2011) (relying in part on sworn expert testimony in finding that defendant's software was primarily designed to circumvent a technological measure under 17 U.S.C. §§ 1201(a)(2), (b)(1)).

Moreover, Defendants' argument that the CUE Service has a commercially significant purpose because it offers non-infringing content is unpersuasive. As Plaintiffs point out, Defendants cannot avoid liability under the DMCA simply by mixing authorized content with unauthorized content. (Reply 5:6–14) (citing *DISH Network L.L.C. v. Strongtimes Int'l Ltd.*, No. 2:25-cv-05863-WLH-JPR, 2026 WL 1008938, at *3-4 (C.D. Cal. Jan. 22, 2026) (finding violations of sections 1201(a)(2) and (b)(1) sufficiently pleaded based on the defendants' trafficking in a streaming service that circumvented DRM technology to transmit certain channels without authorization, even though the service reported having more than 11,000 total channels)). The Court thus finds that Plaintiffs have met their burden in showing a likelihood of success on the merits of their DMCA claims.

However, the Court notes that Plaintiffs have produced evidence showing only that twenty-three (23) channels transmitted on the CUE Service originated from Plaintiffs. (Duval Decl. ¶¶ 5–6, Ex. 3 to Mot. TRO). Accordingly, the Court finds that Plaintiffs have met their burden on this element only with respect to those twenty-three channels. Because the DMCA authorizes injunctive relief only to "prevent or restrain a violation," the Court's preliminary injunction will be limited to retransmission of those twenty-three (23) channels only. 17 U.S.C. § 1203(b)(1).

**b. ECPA Claim**

Plaintiffs' third claim asserts a violation of §§ 2511(1)(c)–(d), and 2520 of the ECPA. (Compl. ¶¶ 52–58). Section 2511(1)(c) makes it unlawful for any person to "intentionally disclose[], or endeavor[] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was

obtained through the interception of a wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(c). Section 2511(1)(d) makes it unlawful for any person to "intentionally use[], or endeavor[] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C. § 2511(1)(d).[4]

Plaintiffs argue that they are likely to succeed on the merits of their ECPA claim because they have established that (1) channels transmitted on the CUE Service were intercepted from Plaintiffs' communications, (2) those channels were acquired from Plaintiffs' communications without their consent, and (3) the Defendants knew that those channels were intercepted because Plaintiffs served a cease-and-desist letter on Defendants. (Reply 5:19–25). Defendants argue that Plaintiffs have not established that any communications were intercepted, and that any interception could not have been done knowingly because Defendants never received a cease-and-desist letter from Plaintiffs. (Opp. 11:24–12:15).

Here, Plaintiffs have presented sworn expert testimony demonstrating that certain channels transmitted through the CUE Service originated from Plaintiffs. (*See* Chrissan Decl. ¶¶ 10–21, Ex. 4 to Mot. TRO). Thus, the Court finds that Plaintiffs have shown that Defendants intercepted their communications. Further, Defendants' argument that any use or disclosure of intercepted communications was unintentional because they never received Plaintiffs' cease-and-desist letter is unavailing. For interception to be intentional under the ECPA, a defendant must have acted "purposefully and deliberatively and not as the result of accident or mistake." *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015). Plaintiffs provide a significant amount of evidence that this standard was met here, including a demonstration that channels transmitted on the CUE Service originated from Plaintiffs, and

[4] Section 2520 of the ECPA authorizes statutory damages for each violation of Sections 2511(1)(c) and (d) in the amount of "the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. § 2520(b)(2), (c)(2).

proof that the cease-and-desist letter was delivered to an address registered to Defendant Weddell. (Chrissan Decl. ¶¶ 10–21, Ex. 4 to Mot. TRO); (Gedeon Decl. ¶¶ 3–5, Ex. 3 to Reply, ECF No. 32-3). The Court thus finds that Plaintiffs have met their burden in showing a likelihood of success on the merits of their ECPA claim.

Again, however, because Plaintiffs have produced evidence showing only that twenty-three (23) channels transmitted on the CUE Service originated from Plaintiffs, the Court finds that Plaintiffs have met their burden on this element only with respect to those twenty-three (23) channels. As explained in the preceding section, the Court's preliminary injunction will be limited to retransmission of those twenty-three (23) channels only.

**2. Irreparable Harm**

Plaintiffs contend that they will be irreparably harmed absent a preliminary injunction because they will suffer loss of goodwill and profits as a result of Defendants' unauthorized transmission of their channels. (Mot. TRO 10:28–12:23) (citing *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable … .")). In response, Defendants argue that Plaintiffs' showing of irreparable harm is insufficient because they waited several months after issuing a cease-and-desist letter to seek a TRO and produced only conclusory evidence of loss of goodwill and profits. (Opp. 12:17–14:20).

Again, Defendants arguments are unpersuasive. First, their argument that Plaintiffs' evidence of irreparable harm is conclusory is based solely on that evidence coming from declarations made by employees of Plaintiffs. (*Id.* 12:26–13:3). The caselaw that Defendants rely on in making that argument admits of no prohibition on the use of employee declarations for this purpose. For example, in *POM Wonderful LLC v. Pur Beverages LLC,* No. 13-cv-

06917, 2015 WL 10433693 (C.D. Cal. Aug. 6, 2015), upon which Defendants rely, while the district court rejected the plaintiff's showing of irreparable harm as "conclusory and speculative," it did so not because it came from employee declarations—rather, the court rejected the plaintiff's *theory* of irreparable harm. 2015 WL 10433693 at *13. Second, while Plaintiffs did wait over three months after delivery of the cease-and-desist letter to seek an injunction in this Court, the Ninth Circuit has noted that delay in seeking injunctive relief is often insufficient on its own to refute a determination of irreparable harm. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) ("Usually, delay is but a single factor to consider in evaluating irreparable injury; indeed, courts are loath to withhold relief *solely on that ground.*") (emphasis added). Finally, Defendants concede that "loss of customers, reputation, and goodwill" can constitute irreparable harm. (*Id.* 12:25–26). The Court thus finds that Plaintiffs have met their burden with respect to this element.

**3. Balance of the Equities**

Plaintiffs contend that the balance of the equities tips in their favor because, while they will suffer loss of goodwill and profits absent an injunction, an injunction will only cause Defendants "to cease from profiting from their unlawful conduct." (Mot. TRO 12:25–13:5) (citing *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (finding that profits lost from the enjoined sale of infringing goods is not a recognizable harm)). In response, Defendants argue that because only a small fraction of channels transmitted on the CUE Service are allegedly infringing, an injunction shutting down the CUE Service in its entirety is overly broad, and thus the balance of the equities tips towards them. (Opp. 14:26–27).

As explained above, because Plaintiffs have only identified twenty-three (23) channels which originated from Plaintiffs, any injunction issued by the Court will enjoin only retransmission of those identified channels. *See* Section (III)(A)(1)(a)–(b). Thus, Defendants'

concerns are insufficient to rebut Plaintiffs' showing on this element, and the Court finds that Plaintiffs have met their burden with respect to this element.

**4. Public Interest**

Plaintiffs argue that an injunction serves the public interest because it would enjoin only activities which violate federal law. (Mot. TRO 13:15–26) (citing *DISH Network LLC v. Dillion*, No. 12-cv-157-BTM-NLS, 2012 WL 368214, at *5 (S.D. Cal. Feb. 3, 2012) ("[T]he public has a strong interest in the enforcement of anti-piracy legislation.")). In response, Defendants again focus on the scope of the injunction, reasoning that an injunction that shuts down the CUE Service in its entirety would constitute an unconstitutional prior restraint and thus cannot be in the public interest. (Opp. 15:19–16:9). However, as Plaintiffs point out, "First Amendment concerns do not immunize infringing activity from appropriately tailored injunctive relief." (Reply 12:22–26) (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001) (rejecting the contention that an injunction against infringing activity violated the First Amendment while requiring the injunction to be properly tailored to the unlawful conduct)). Again, because the injunction targets only the twenty-three (23) channels that Plaintiffs have identified as infringing, Defendants arguments are insufficient to rebut Plaintiffs' showing on this element, and the Court thus finds that Plaintiffs have met their burden with respect to this element.

Accordingly, because Plaintiffs have met their burden on all four of the *Winter* elements, the Court finds that the entry of a preliminary injunction is warranted in this case.

**B. Asset Freeze**

The TRO previously entered by the Court froze all asserts or property belonging to or under the management of Defendants. (Order Granting Mot. TRO 6:5–13). In that Order, the Court found that an asset freeze was warranted because of Defendant Weddell's history of financial misconduct; namely, three felony tampering with records convictions, three felony

forgery convictions, a felony theft by deception conviction, and nine felony grand theft convictions. (*Id.* 3:22–4:6). Defendants now assert that any preliminary injunction entered by the Court should not contain an asset freeze, arguing that Defendant Weddell's prior convictions are insufficient to justify such injunctive relief. (Opp. 17:3–17).

**1. A Continued Asset Freeze is Warranted**

Federal courts have the authority to preserve assets pending final judgment where necessary to preserve equitable remedies and prevent a defendant from frustrating the Court's ability to provide complete relief. *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *Reebok Intern., Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559–560 (9th Cir. 1992). An asset-freeze injunction is improper if used solely to preserve assets for use in satisfying a claim for money damages. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund*, *Inc.*, 527 U.S. 308, 330–33 (1999). However, where an equitable remedy is available, the district court "has the power to issue a preliminary injunction to preserve the status quo in order to protect the possibility of that equitable remedy." *Datatech Enters. LLC v. FF Magnat Ltd.*, No. C-12-04500-CRB, 2012 WL 4068624, at *4 (N.D. Cal. Sept. 14, 2012) (internal quotation marks omitted). Here, the DMCA authorizes disgorgement of profits, a "classic equitable remedy," which Plaintiffs explicitly seek in their Complaint. *Id.* at *5 (citing *Chauffeurs Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990)); 17 U.S.C. § 1203(c); (*see* Compl. 17:22–18:6).

In addition to the presence of an equitable remedy, a party seeking an asset freeze must show a likelihood of dissipation of the claimed assets. *Johnson*, 572 F.3d at 1085. In determining the likelihood of dissipation of assets, courts in the Ninth Circuit have looked to evidence that defendants are in the process of dissipating assets, are strategizing to do so in the future, or have a history of past financial misconduct. *See, e.g.*, *Conn. Gen. Life Ins. Co.*, 321 F.3d at 881 (affirming district court that expressly found it "was not only possible, but probable" defendant would dissipate assets based on her past history of fraudulent intra-family

transfers, concealment of assets in defiance of a court order, and a conveniently timed divorce settlement.).

In *Johnson*, the Ninth Circuit found that it was not an abuse of discretion to issue an asset freeze based on the defendant having "convinced his fellow directors and trustees to consent to diverting nearly $35 million from [an employee stock ownership plan] into his personal bank account." 572 F.3d at 1085. The court found that "[s]uch an individual is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment." *Id.* Here, Defendant Weddell's past convictions demonstrate a similar (if not more expansive) history of financial misconduct which the Court finds sufficient to justify an asset freeze. Thus, because Plaintiffs seek an equitable remedy and have shown a likelihood of dissipation of assets, the Court will keep the asset freeze in place.

**2. Scope of the Asset Freeze**

At the preliminary injunction hearing on July 13, 2026, Plaintiffs submitted a copy of Defendants' List of Assets and Property, which includes, among other things, the fourteen racks of CUE servers that the Court previously ordered be taken offline, air gapped, and wrapped in evidence tape. (*See* Order Granting Mot. TRO 7:21–8:10); (List of Assets 2:1–12, Ex. 1 to July 13 Minutes, ECF No. 39). In order to meaningfully preserve the status quo, the Court extends the asset freeze to cover those servers and all other assets identified by Defendants in their List of Assets. Further, the Court will require Defendants to provide an updated accounting of all assets and property belonging to or manages by Defendants.

**C. FRCP 65(c) Bond Amount**

FRCP 65(c) permits the issuance of a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been unlawfully enjoined or restrained." Fed. R. Civ. P. 65(c). In its Order Granting TRO, the Court required Plaintiffs to post a bond of $10,000. (Order Granting

Mot. TRO 4:16–18). Defendants now request that the Court increase that bond amount "to at least $9,000,000 to account for Defendants' loss of subscribers and decrease in revenue." (Opp. 19:10–11). However, that figure represents the total gross revenue of the CUE Service—as explained above, because the preliminary injunction is limited only to the twenty-three (23) channels that Plaintiffs have identified as infringing, any increase in Plaintiffs' bond amount would need to be reduced to reflect the narrowed scope of the injunction.

Defendants' List of Assets asserts that the balance in Defendants' bank accounts totals roughly $1,834.95. (*See* List of Assets 1:21–2:24, Ex. 1 to July 13 Minutes). Defendants provide no further support for their estimation of the CUE Service's gross revenue. (*See generally* Opp.). Given the lack of evidence supporting Defendants' $9,000,000 figure and the narrowed scope of the injunction, the Court declines to alter the bond amount originally set forth in the TRO.

## IV. <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the Motion to Set Aside Temporary Restraining Order, (ECF No. 22), is **DENIED as moot.**

**IT IS FURTHER ORDERED** that the Motion for Leave to File Excess Pages, (ECF No. 31), is **GRANTED.**

**IT IS FURTHER ORDERED** that the Motion to Stay Preliminary Injunction Pending Appeal, (ECF No. 35), is **DENIED as moot.**

**IT IS FURTHER ORDERED** that the Court converts its Temporary Restraining Order, (ECF No. 7), into a Preliminary Injunction.

///

///

///

///

**IT IS FURTHER ORDERED** that Defendants and any of their officers, agents, servants, employees, and those acting in active concert or participation with them, including affiliates and resellers, who receive actual notice of this Order are **ENJOINED** and must **RESTRAIN** from directly or indirectly:

(a) receiving or assisting others in receiving the following channels without authorization by Plaintiffs:

(i) 402 MLB Arizona Diamondbacks

(ii) 403 MLB Oakland Athletics

(iii) 404 MLB Atlanta Braves

(iv) 405 MLB Baltimore Orioles

(v) 406 MLB Boston Red Sox

(vi) 408 MLB Chicago White Sox

(vii) 409 MLB Cincinnati Reds

(viii) 414 MLB Kansas City Royals

(ix) 415 MLB Los Angeles Angels

(x) 417 MLB Miami Marlins

(xi) 421 MLB New York Yankees

(xii) 430 MLB Toronto Blue Jays

(xiii) 431 MLB Washington Nationals

(xiv) 454 NBA Brooklyn Nets

(xv) 455 NBA Charlotte Hornets

(xvi) 457 NBA Cleveland Cavaliers

(xvii) 461 NBA Golden State Warriors

(xviii) 465 NBA Los Angeles Lakers

(xix) 467 NBA Miami Heat

(xx) 468 NBA Milwaukee Bucks

(xxi) 475 NBA Phoenix Suns

(xxii) 477 NBA Sacramento Kings

(xxiii) 481 NBA Washington Wizards

(b) intentionally disclosing or using the above channels knowing or having reason to know that they were obtained through interception;

(c) destroying, deleting, concealing, hiding, transferring, or altering in any manner:

i. any computers and servers used to operate and support the CUE Service;

ii. any DRM circumvention tools or keys;

iii. any business records relating to sales, subscriptions, account activations, and support of the CUE Service; and

iv. any communications with other operators or technical personnel, affiliates, resellers, suppliers, and hosting providers for the CUE Service; and

(d) transferring, removing, encumbering, or permitting the withdrawal of any assets or property belonging to or under the management of Defendants, whether real or personal, tangible or intangible, including cash, virtual currency, financial or investment accounts of any kind, or title to any property. This temporary asset freeze includes, but is not limited to, all of Defendants' accounts at Bank of America, N.A, including account numbers ending in 3497, 6992, and 5027, and First Financial Bank. Additionally, Defendants can access funds that they require to pay their legal fees in this action and other reasonable and necessary business and personal expenses, either after reaching an agreement with Plaintiffs' counsel or by seeking leave from this Court. Finally, this assert freeze extends to the fourteen racks of CUE servers identified in Defendants' List of Assets that the Court previously ordered be taken offline, air gapped, and wrapped in evidence tape. (*See* Order Granting Mot. TRO 7:21–8:10); (List of Assets 2:1–12, Ex. 1

to July 13 Minutes).

**IT IS FURTHER ORDERED** that no later than seven (7) court days following service of this Order, Defendants must provide Plaintiffs a written accounting of all assets and property belonging to Defendants, which in the case of any bank account shall include the account name, number, current balance, and location of the bank or other custodian holding such account.

**IT IS FURTHER ORDERED** that Plaintiffs or their representatives or counsel shall have free use of the Limited Discovery obtained as part of the Court's previous Temporary Restraining Order, and copies thereof for purposes of prosecuting television piracy, provided the Limited Discovery is not altered or lost. (*See* Order Granting Mot. TRO 6:18–11:3).

**IT IS FURTHER ORDERED** that this injunction takes effect immediately and shall remain in effect pending the above show cause hearing or further order of this Court.

**DATED** this 15 day of July, 2026.

Gloria M. Navarro, District Judge
United States District Court